IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:23-CR-260-M-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | **GOVERNMENT'S RESPONSE** |
| v. | ) | **IN OPPOSITION OF MOTION TO** |
| | ) | **REVIEW DETENTION ORDER** |
| MICHAEL KENNETH COX | ) | |

The United States of America responds in opposition to Defendant's motion for review of Order of Detention entered by Magistrate Judge James E. Gates on September 6, 2023. [D.E. 28]. In support of its opposition, the Government incorporates the audio recording from the detention hearing held before Judge Gates on September 6, 2023, and the 22 exhibits entered into evidence during such hearing. The United States also requests the Court to consider the additional factual evidence set forth below and in the attached exhibits.

## FACTS

Cox was hired as a permanent deputy at WCSO in 1997. Although he began his career as a patrol officer, he was promoted to the Aggressive Criminal Enforcement ("ACE") traffic team in 2002. In 2007, Defendant was promoted to head of the ACE team, where he worked until 2010, when he was promoted to WCSO's Drug Unit. During his tenure on the ACE team, Defendant earned a reputation for the aggressive methods he used during traffic stops. During this period he also began

1

seizing evidence (including firearms and narcotics) from citizens without ever opening case files.[1]

On July 21, 2011, Defendant and other members of the WCSO's Drug Unit seized $103,676 in cash from a drug dealer's main stash house on Peele Road in Wayne County ("Peele Road"). Defendant was made head of the Drug Unit in 2016. By this date, if not earlier, Defendant began providing a violent drug dealer referred to in the indictment as Drug Trafficker One ("DT1") with some level of protection from serious law enforcement prosecution.

In 2017, a violent drug dealer referred to in the indictment as Drug Trafficker Two ("DT2") was approached by Defendant about arranging for a home invasion of the Peele Road stash house. Defendant indicated that he believed there could be a large amount of cash at the location. In addition to DT2's statement about Defendant's ordering DT2 to arrange for the Peele Road home invasion, Defendant sent DT2 CJ Leads information on the person residing at Peele Road and them a pin drop of the exact location of the home. *See* Detention Exh. 2.

On June 19, 2017, just ten days after Defendant texted the location pin drop to DT2, a violent home invasion occurred at the Peele Road house. The home invasion turned very violent and resulted in injuries to minor victims. Notwithstanding the high profile of the WCSO investigation of Peele Road home invasion, Defendant withheld information about DT2's involvement in the home invasion from the WCSO deputy investigating the case.

---

[1]As of the date of the filing of this brief, the number of firearms in the WCSO that cannot be tied to actual cases stands at approximately 116 weapons.

Also in 2017, Defendant provided false information to the Drug Enforcement Agency ("DEA") regarding DT2's involvement in the purchase of cocaine from a cocaine trafficker that was targeted by the DEA. Specifically, after observing DT2 illegally purchase cocaine from the DEA's target, Defendant chose to treat the matter as a controlled purchase, which it was not. Defendant then provided false information to DEA stating that DT2 purchased the cocaine from the target a part of a controlled purchase. *See* Detention Exh. 1.

On April 26, 2018, DT1 was caught on videotape entering a drug stash house in Goldsboro with a handgun in his right hand and then exiting the house minutes later. *See* Detention Exh. 3. Immediately after DT1 drove away from the house, a drug dealer is shown on the video limping out of the stash house with a gunshot wound in his leg and then sitting on the front patio to await an ambulance. *Id.* Soon after the shooting, DT1 contacted Defendant and requested that Defendant keep DT1 apprised of anything he heard about the shooting. Soon after the incident, Defendant began telling people in the law enforcement community that the handgun in the video was actually a BB gun.[2]

During his tenure as head of the Drug Unit, Defendant was able to block any Goldsboro Police Department's ("GPD") investigation into DT2. Although GPD was able to conduct a search which led to DT2's arrest just prior to Defendant's retirement, Defendant was still able to work behind the scenes to get an attorney

---

[2]Notwithstanding Defendant's attempt to protect DT1 with the BB gun story, during a conversation with DT2's longtime girlfriend in February 2021, Defendant admitted that DT1 "had been caught on camera shooting a man." Exhibit 1, attached hereto, at ¶ 4.

3

lined up to represent DT2 and to provide advice to DT2 on how to challenge GPD's search warrant.

On February 19, 2019, more than four months after Defendant's retirement from WCSO, he was able to use WCSO contacts to provide DT2 with an alibi for the attempted murder of a WCSO informant. Within hours of the shooting, Defendant contacted the Drug Unit deputy (who he had supervised just months before) and informed him that DT2 was not involved in the shooting because DT2 had been facetiming Defendant all evening.[3] *See* Detention Exh. 6 at pg. 4. From February 20, 2019, to July 2019, Defendant exchanged dozens of text messages with DT2, both about DT2's charges and more person matters.

In late June 2019, Defendant and DT2 discussed getting money on the canteen account of a drug trafficker referred to as in the indictment Drug Trafficker Three ("DT3"). Detention Exh. 7 at 3. Defendant also stated that he was trying to use his contacts to find out about DT3's case and would then contact DT3. *Id.* at 1.

On July 10, 2019, Defendant was interviewed by the Alcohol, Tobacco, and Firearm ("ATF") about DT2's shooting of an informant that law enforcement had planned to use to make controlled purchases buys from DT2. Notwithstanding the large number of text exchanges between Defendant and DT2 since the February 19, 2019, shooting, Defendant falsely stated to the ATF that he "did not hear from [DT2] for about three months after the shooting." *See* Exhibit 2, attached hereto, at ¶ 11.

---

[3]Defendant had purchased oxycodone pills from DT2 just five days prior to the shooting. The text message evidencing Defendant's purchase of oxycodone is found at Detention Exh. 6 at pg. 1.

4

On December 4, 2019, DT2 was arrested by WCSO in possession of two kilograms of powder cocaine. As DT2 was being driven back to the WCSO Annex for processing, the deputy driving DT2 back to the WCSO Annex received a call from Defendant. The deputy, who was surprised Defendant had learned of the arrest so quickly, did not answer the phone because DT2 was in the car. The toll record evidencing Defendant's call to the deputy is shown in Detention Exh. 8. In DT2's jailhouse call to his girlfriend just after being arrest, DT2 asks his girlfriend "what MC say?" Later in the week, DT2 informed his girlfriend that he was waiting "to see what MC say."

In January 2020, Defendant texted the following to the WCSO deputy who made a digital copy of DT2's phone:

> I know you dumped [DT2's] phones and have read all the text messages. Why didn't you say anything abt when I talked to you earlier. I really don't give a shit. Cause there ain't nothing on any of his phones that would get me in trouble. But damn!! Why is everyone so secretive?? I hope somebody comes to speak to me. Cause I will blow the roof off that dumb ass office!! Thanks for looking out.

In January and February 2020, Defendant continued his practice of purchasing pills from DT1. See Detention Exhs. 9-10. In February 2020, Defendant exchanged numerous text messages with DT2's girlfriend about putting money on DT2's canteen account and also regarding the status of the charges. Defendant also texted DT2's girlfriend at least two pictures showing a penis and then requested that she text him a picture of her breasts. The Government recovered these text messages from the cell phone of DT2's girlfriend.

5

From late 2020, through to February 25, 2021, Defendant and DT1 exchanged numerous text messages and telephone conversations regarding Defendant purchase of pills from DT1. *See* Detention Exhs. 11-16. On February 25, 2021, DT1 discovered a GPS tracker that the ATF had placed on his car. DT1 contacted the Defendant to get information about who was investigation him. *See* Detention Exh. 17. Defendant immediately reached out to the two top deputies in the WCSO Drug Unit and was able to ascertain that the ATF was conducting the investigation. *See* Detention Exh. 19. Defendant warned DT1 of this fact, which led DT1 to inform members of his drug trafficking organization of the ATF's investigation. *Id.*

During a recorded conversation with DT2's girlfriend on March 5, 2021, Defendant stated as follows: "I fuck with [DT1] a little bit too, I've always fucked with [DT1] a little bit. . . . [DT1s] always been a friend of mine." Defendant then admitted that DT1 was a source for Defendant to get Percocet pills and that DT1 had come to his house at least twice in the weeks leading up to the discovery of the GPS tracker. Defendant also stated that he had advised DT1 not to return the GPS tracker to law enforcement.

On March 12, 2021, during a recorded call with Defendant, DT2 asked Defendant for help with the charges from December 2019, which had been indicted federally. Defendant stated he could not do anything on the highway charges (which were federal), but, as to the remaining state charges, the locals "can't do nothing with that mess without me and I ain[']t never going back up there." *See* Exhibit 3, attached hereto, at ¶ 5.

6

On or about March 20, 2021, DT2's girlfriend received a call from Defendant demanding to know if the "feds had her wear a wire" during their recent meetings. Defendant further stated that the "feds are looking at him because of the tracker and pills." During this conversation, or a conversation soon thereafter, Defendant stated to DT2's girlfriend that he would not go to jail, but would rather kill himself.

On September 16, 2021, the Federal Bureau of Investigation ("FBI") served a federal grand jury document subpoena on WCSO requesting records relating to possible procurement fraud and also Defendant's handling of drug informants and controlled purchase operations. The lead FBI agents met personally with the Sheriff of Wayne County and disclosed some of the evidence of Defendant's involvement with DT1. The FBI then requested the Sheriff to refrain from communicating any information about the WCSO document subpoena with Defendant. Notwithstanding this request, Defendant was able to use his contacts at WCSO to ascertain that the FBI's investigation that went beyond possible procurement fraud.

On or about September 20, 2021, the FBI served federal grand jury subpoenas on Defendant's various business entities. On September 21, 2021, Defendant made two calls to the FBI to discuss the grand jury subpoenas served on his businesses. During these conversations, which were recorded by the FBI, Defendant lied to the FBI agent about the nature of his relationship with DT1 and DT2. In addition, Defendant provided false information about his involvement in procurement fraud.

In February 2022, the FBI executed a search warrant at Defendant's business location. Although the FBI was able to seize Defendant's cell phone, certain compromising text messages with DT2 had been deleted.

On August 17, 2023, a federal indictment was returned, under seal, charging Defendant with a drug trafficking conspiracy, a wire/mail fraud conspiracy, substantive wire and mail fraud charges, and two § 1001 charges. In light of Defendant extensive gun collection and his previous statement about potential suicide, the FBI planned the arrest in a manner which allowed Defendant little decision but to quickly submit to arrest. A detention hearing was held before Judge Gates on September 6, 2023, and Defendant was ordered detained pending trial as a risk of flight and a danger to the community.

## ARGUMENT

Pre-trial detention is required when, after a hearing, "a judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." *United States v. Sidbury*, No. 5:15-CR-184-FL-6, 2015 WL 8481874, at *1 (E.D.N.C. Dec. 8, 2015). If a defendant is charged with a federal drug trafficking offense having a maximum punishment of ten years or more, as is the case here, a rebuttable presumption arises in favor of detention. 18 U.S.C. § 3142(e)(2). However, as noted by Judge James C. Fox in a 2011 order, which was cited by defense counsel, the "presumption imposes on the defendant only the burden *of production* of proof." *United States v. Tyson*, No. 7:11-CR-105-3F, 2011 WL 4443253, at *1 (E.D.N.C. Sept.

8

23, 2011) (emphasis in original). While the United States is in full agreement with defense counsel reading of this portion of *Tyson*, it is also necessary to consider the following additional comments by Judge Fox regarding the continued impact of the presumption even after a defendant makes a production of proof:

> Upon the defendant's introduction of evidence in support of his release, the statutory presumption in favor of detention does not vanish, but retains evidentiary weight and remains as one factor to be considered. The Court may take into consideration the legislative finding by Congress that persons who commit drug-trafficking offenses pose a special risk of flight and a special danger to the safety of the community.

*Id. See also Sidbury* at 1; *United States v. Owens*, No. 5:20-CR-26-BR, 2020 WL 3884428, at *2 (July 2020).

As to the "risk to the danger to the community" prong, it is the "government's burden to establish by clear and convincing evidence that no conditions of release will reasonably assure the safety of the community." *Sidbury* at 1. As to the "risk of flight" prong, the Government must prove "by a preponderance of the evidence" that no conditions of release will reasonably assure Defendant's attendance at trial. *Id*.

Section 3142(g) sets forth a number of factors to consider in determining if detention is warranted. The first factor is the "nature and circumstances of the offense charged including whether the offense" involves controlled substances or firearms, which is the case here. Next, the weight of the evidence of the charges conduct. Third, the history and characteristics of the person. Fourth, the nature and seriousness of the danger posed by release of the Defendant.

**I.** **<u>No conditions of release will reasonably assure the safety</u>**

**of the community**.

As to the nature and circumstances of the drug offense charged here, two things cannot be emphasized enough. First, the violent conduct, often involving firearms, engaged in by DT1 and DT2 while under Defendant's protection. Second, the importance of Defendant to DT1 and DT2's large[4] drug trafficking operations.

As to the weight of the evidence in this case, it is substantial by any metric. Defense counsel's claim that the Government's case relies on little more than hearsay evidence from DT1 and DT2, ignores the trove of text messages and recorded calls corroborating the claims against the Defendant.

As to Defendant's history and characteristics, defense counsel's characterization of Defendant as a "hardworking, family-man" is inaccurate. As to his business operations, it is clear that they were propped up by contracts obtained from WCSO through procurement fraud. As to his personal character, his decision to weaponize his badge to empower violent drug dealers to operate unchecked by law enforcement shows the real nature of the man. Likewise, any claim that Defendant is a just a regular "family-man" is contradicted by a reading of his text messages, which reveals his true nature. In addition to his communications with DT2's girlfriend, Defendant and DT2 engaged in the following text conversation starting at 10:20 pm on July 11, 2019, while Defendant was at a nightclub called Morgans:

> Defendant: I want some black pussy tonight

---

[4] DT1's drug trafficking organization was responsible for approximately 2,500 grams of crystal meth, 4,500 grams of cocaine, 250 grams of heroin and 37 grams of fentanyl. As to DT2, his operation involved approximately 5,900 grams of heroin, 1,000 grams of crack and 50 kilograms of cocaine.

10

| | |
|---|---|
| DT2: | Who you want? |
| | I got you lol |
| Defendant: | A bad bitch. |
| DT2: | Let me see what I can find |
| | Anybody there? |
| Defendant: | Just some Mexican bitches |
| DT2: | Word lol |

It is worth noting that this text conversation occurred the day after Defendant lied to the ATF during an interview about DT2's shooting of an informant.

    The nature and seriousness of the danger posed by the Defendant to the community is shown by his past actions. The following evidence, which was presented at the earlier detention hearing, speaks to danger posed by the Defendant. First, the fact that Defendant, with full knowledge of the violent nature of DT2, arranged for DT2 to go to a high school and threaten an underaged boy speaks volumes of Defendant's dangerous nature. If Defendant is willing to risk that level of violence on an underage high school student in a dispute with his daughter, what would he be willing to do to avoid a lengthy federal prison sentence. Furthermore, Defendant's decision to allow DT2 to come to his home during a cookout in 2018 shows he is willing to endanger his family and neighbors. This is also shown by his decision to let DT1 come his home on more than one occasion to deliver pills to Defendant's mailbox.

Finally, as noted above, the Court should also consider the "finding by Congress that drug offenders pose a special risk of flight and dangerousness to society." *United States v. Hare*, 873 F.2d 796, 798-99 (5th Cir. 1989).

## II. <u>No conditions of release will reasonably assure Defendant's appearances as required</u>.

As to the "risk of flight" prong, Defendant's claim that he has strong ties to the community including a successful business is not completely accurate. As noted above, a large percent of Defendant's business was generated through procurement fraud. As to family ties, his text message history with DT2, girlfriends of drug dealers, and other deputies makes it difficult to assess the strength of his family ties.

As to his claim that he has been fully cooperative with the federal investigation, the facts show otherwise. First, he lied to the ATF in July 2019, regarding the level of communication and assistance he provided to DT2 after the shooting of a WCSO informant by DT2. Second, he used his contacts with WCSO in February 2021 to provide DT1 with information about the ATF's investigation. This action resulted in the federal wiretap coming down sooner than planned and allowed DT1 time to hide assets and drugs. Third, following service of grand jury subpoenas on his business entities he was able to use a contact in WCSO to determine the scope of the federal investigation and then called the FBI and lied about a number of material matters. Fourth, although it is unclear when Defendant erased compromising text messages with DT2, it is clear from a review of Defendant's phone seized in February 2022, that such messages were erased by Defendant.

Finally, in light of significant sentence that Defendant is likely to face if convicted and his comment to DT2's girlfriend in early 2021 about killing himself rather than go to jail, the risk of flight is this case supports detention.

Respectfully submitted this 2nd day of October 2023.

                                        MICHAEL F. EASLEY, JR.
                                      United States Attorney

BY:   /s/ Dennis M. Duffy
        DENNIS M. DUFFY
        150 Fayetteville Street, Ste. 2100
        Raleigh, NC 27601
        Telephone: (919) 856-4530
        Facsimile: (919) 856-4821
        Email: dennis.duffy@usdoj.gov
        NC Bar No. 27225

## **CERTIFICATE OF SERVICE**

I certify that I have on this the 2nd day of October 2023, served a copy of the foregoing Response upon counsel for Defendant via CM/ECF:

>Hart Miles
>Cheshire, Parker, Schneider, PLLC
>Post Office Box 1029
>133 Fayetteville Street, Ste. 500
>Raleigh, NC 27602

>BY: /s/ Dennis M. Duffy
>DENNIS M. DUFFY
>150 Fayetteville Street, Ste. 2100
>Raleigh, NC 27601
>Telephone: (919) 856-4530
>Email: dennis.duffy@usdoj.gov