UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

FILED IN OPEN COURT
ON 10/18/23
Peter A. Moore, Jr., Clerk
US District Court
Eastern District of NC

NO. 5:23-CR-260-1-M
NO. 5:23-CR-260-2-M

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **SUPERSEDING INDICTMENT** |
| | ) | |
| MICHAEL KENNETH COX | ) | |
| CHRISTOPHER C. WORTH | ) | |

The Grand Jury charges that:

## INTRODUCTION

### A. Background, duties, and structure of the Wayne County Sheriff's Office.

1.      The North Carolina Constitution provides that "[i]n each county a Sheriff shall be elected by the qualified voters thereof at the same time and place as members of the General Assembly are elected and shall hold his office for a period of four years." N.C. Const., Art. VII, § 2. The county sheriff is the only office of local government created by the North Carolina Constitution. See N.C. Gen. Stat. § 17E-1.

#### (i)      Sheriff and deputies occupy positions of public trust and are obligated to serve with the utmost integrity.

2.      Although "[t]he sheriff may not delegate to another person the final responsibility for discharging his official duties . . . he may appoint a deputy or employ others to assist him in performing his official duties." N.C. Gen. Stat. § 162-24. "The

1

deputy sheriff has been held by the Supreme Court of this State to hold an office of special trust and confidence. . . ." N.C. Gen. Stat. § 17E-1. "The offices of sheriff and deputy sheriff are therefore of special concern to the public health, safety, welfare and morals of the people of the State." Id.

3. The Wayne County Sheriff's Office ("WCSO") is headquartered in Goldsboro, North Carolina. WCSO's main office is located at 207 East Chestnut Street in Goldsboro ("Main Office"). In addition to Goldsboro, which is the largest city and county seat, Wayne County also encompasses, without limitation, Elroy, Eureka, Fremont, Mount Olive, Nahunta, New Hope, Pikeville, Seven Springs, Walnut Creek, and the Seymour Johnson Air Force Base. Wayne County is located in the Eastern District of North Carolina.

4. In accordance with its duty of trust to the citizens of Wayne County, WCSO operates under the following mission statement:

> It is the mission of the Wayne County Sheriff's Office to maintain a preservation of peace, uphold the constitutionality of the Sheriff's Office, prevent criminal activity and provide judicious service to the community with *__utmost integrity__* in a positive and professional manner.

(Emphasis added).

5. Although WCSO is created by the North Carolina Constitution and is not subject to the management of Wayne County government, its budget is controlled by the Wayne County Board of Commissioners ("County Commissioners"). As such, WCSO must present an annual budget for approval by the County Commissioners. In addition to abiding by the spending limitations contained in its budget, WCSO

2

must also follow procurement procedures set forth by the Wayne County Finance Department ("County Finance") and Wayne County Purchasing Department ("County Purchasing"). These procedures are clearly detailed in the *Wayne County Purchasing & Procedures Manual* ("*Manual*").[1]

6. With the exception of "drug buy" money, which is transferred directly to a WCSO bank account, converted to cash, and then provided to Drug Unit deputies for use in drug investigations, the remainder of WCSO's budget is disbursed through checks issued by County Finance.

### (ii) WCSO's operational structure.

7. From 2003 through approximately 2021, WCSO operations were generally, though not officially, split into two divisions. The first division encompassed those employed to operate the jail and serve as courtroom bailiffs ("Jail/Court Division"). The second division consisted primarily of criminal law enforcement components ("Criminal Division"). The criminal components included the Drug Unit, Detective's Unit, Patrol Unit, Support Services (which handled purchasing), and certain specialized teams. The specialized teams included SWAT, DWI enforcement, School Resources Officers ("SRO"), and Aggressive Criminal Enforcement ("ACE"). The ACE team was created by WCSO to focus on drug interdiction, primarily through "aggressive" traffic stops of suspected drug users and

---

[1]For purposes of this Superseding Indictment, discussion of Wayne County procurement requirements are based on the versions of the *Manual* in effect from January 1, 2016 through April 18, 2023.

3

drug dealers. The ACE team members were typically selected from the Patrol Unit and worked with the goal of being promoted to the Drug Unit.

8.      Prior to 2022,[2] the chain of command under the Sheriff began with two majors, each assigned supervisory control over one of the divisions described above. Although the hierarchy changed slightly over time, during most of this period approximately five captains served in the positions below the two majors. One captain was assigned to supervise the jail/courtroom units and reported to the major in charge of that Jail/Court Division. The remaining four captains reported to the major in charge of the Criminal Division. One of the criminal captains was assigned to supervise the Drug Unit, Support Services, SWAT, DWI team, and ACE team. The remaining captains were typically assigned to the Detective, Patrol/Civil Deputy, and SRO Units. The units under each captain were typically headed by lieutenants.[3]

9.      WCSO's Main Office houses the Sheriff, upper management, and the main county jail. Wayne County's local courts and other offices, including County Finance and County Purchasing, are located in a building that abuts the back of WCSO's Main Office.

10.     WCSO also maintains a fully secured annex located at 1916 U.S. Highway 117 in Goldsboro ("Annex"). The Annex encompasses the official evidence

_____

[2]In approximately 2021-2022, the Sheriff added a third major to his chain of command.

[3]Newly hired deputies on WCSO's criminal enforcement side were usually assigned as patrol deputies. After gaining experience, patrol deputies would typically be promoted to the Drug or Detective Units. The Drug Unit was intended to conduct investigation of complex drug organizations, while the Detective Unit investigated economic crimes, violent crimes, and homicides. The ACE team typically worked under the leadership of the Drug Unit.

4

room, gun armory, Detective Unit, Patrol/Warrants Units, ACE team, and various other law enforcement components. WCSO's Drug Unit was located in the Annex until approximately 2016, when it was allowed to move to an unsecured offsite location.

### (iii) WCSO policies and protocol for handling evidence.

11. Because the Annex was previously used as a jail, WCSO's official evidence room ("Evidence Room") was constructed in an area that previously contained jail cells. As a result, the Evidence Room contains the remains of old shower stalls. The area located outside of the Evidence Room is referred to as the processing room ("Processing Room") and contains evidence packaging material, secure overnight lockers, and a secure drop box.

12. During all times relevant to this Superseding Indictment, WCSO's policies[4] required deputies to package and mark collected evidence with reference to a computed-generated Official Case Number ("OCA Number"), the date of collection, and the name of the collecting deputy. The requirement of creating of an OCA Number for all cases was designed as a safeguard to ensure proper handling of evidence and to allow WCSO to quickly track any item of evidence to an actual case file. Accordingly, WCSO policies prohibited the submission of evidence into the Evidence Room without such evidence having an OCA Number. Destruction or any

---

[4]Some of the most basic policies followed by WCSO in handling evidence were part of each deputy's Basic Law Enforcement Training and was then verbally communicated to deputies during their initial training at WCSO. More specific policies were also set forth in writing by WCSO.

other disposition of an item of evidence could only occur after an OCA Number was opened and the item was submitted to the Evidence Room. Finally, WCSO policy required a written chain of custody to be kept in the event any item of evidence was removed from the Evidence Room.

13. WCSO's policies also required that deputies submit evidence into the Evidence Room as soon as possible after seizure and prohibited the storage of evidence in WCSO personal workspace, lockers, and vehicles. The Evidence Room was operated by trained deputies referred to as evidence technicians ("Evidence Techs"). Because Evidence Techs were not always on duty after normal business hours, the Annex was set up to accommodate after-hours intake of evidence. Specifically, deputies had access in the Processing Room to secure intake boxes and lockers for overnight storage. Once the doors on the overnight boxes/lockers were shut and locked, they could only be accessed by Evidence Techs for later input into the Evidence Room.

**B.** **WORTH and COX's posts of duty from 1993-2012.**

14. CHRISTOPHER C. WORTH was hired by WCSO in late 1993 and promoted to the Drug Unit in approximately 1996. MICHAEL KENNETH COX was sworn in as a special deputy at WCSO in 1996 and made a permanent deputy in approximately 1997. COX joined the ACE team in 2002 and was promoted to head of the team in 2007. During his tenure on the ACE team, COX began his practice of holding seized items without opening OCAs relating to the seizure of such evidence.

15.     No later than 2003, COX began operating a side-business installing equipment on law enforcement vehicles. At the time, COX ran his business out of the backyard of his home in Pikesville, North Carolina. Although COX used a number of incorporated entities over the years, he always did business under the name Eastern Emergency Equipment or "EEE." WORTH worked as a contract employee for COX from approximately 2006 to sometime in 2021.

16.     In approximately 2010, COX was promoted to WCSO's Drug Unit, where WORTH was already serving in a higher-level position.

17.     In approximately 2011, a COX protégé was promoted from patrol to work as a detective in the Drug Unit ("Drug Unit Subordinate One"). Drug Unit Subordinate One worked for COX at EEE from approximately 2006-2020.

18.     On July 21, 2011, COX participated in the search of the home of a known drug dealer ("Peele Road Drug Dealer"). During the search of the home ("Peele Road Residence"), COX and others seized $103,676 in cash. COX transported the cash back to WCSO, where it was held in the Evidence Room. COX and Drug Unit Subordinate One later transported the cash to a local bank and converted it to a cashier's check. WORTH was listed as a witness to COX and Drug Unit Subordinate One's handling of the cash.

C.     **Drug Unit's failure to follow basic evidence handling policies during the period from 2012-2016.**

19.     Law enforcement officers entrusted with the responsibility for investigating drug trafficking organizations typically do so by conducting controlled purchases ("Controlled Purchase"). During a Controlled Purchase, law enforcement

7

officers ("LEO") use a cooperating informant ("CI") to purchase drugs with money provided by law enforcement (commonly referred to as "buy money"). This practice is crucial to the success of an investigation because it is much easier for a CI to gain access to a drug dealer than it would be for an unknown undercover officer.

20.     Although Controlled Purchase operations differ based on the facts involved in the particular case, LEO reports sometimes, but not always, include a description of rules governing a CI's cooperation, the events surrounding the Controlled Purchase of drugs, the amount of buy money used in the operation, whether video/audio equipment was used by the CI, and any LEO surveillance (if surveillance was possible based on the facts) of the CI as they traveled to the deal location. Following the drug deal, documentation sometimes includes a description of LEO surveillance of the CI as they return back to law enforcement (if surveillance was possible), and the amount and type of drugs purchased.

21.     In approximately 2012, WORTH was promoted to lieutenant in charge of the Drug Unit, and COX was promoted to WORTH's second in command. From 2012 to 2016, WORTH and COX often operated the Drug Unit without regard to the procedures and protocol that applied to other deputies in the WCSO. During this time, the Drug Unit was housed in the WCSO Annex. Notwithstanding WCSO rules directly to the contrary, the Drug Unit often kept evidence in personal lockers and on designated shelves in the Evidence Room that were not accessible to Evidence Techs. These evidence handling practices were used by the Drug Unit to avoid opening OCA Numbers on some of their cases.

22.     The Drug Unit's off-the-books method of handling evidence provided it with the ability to avoid creating any record of a drug suspect's arrest for drug dealing. In addition, it allowed members of the Drug Unit the ability to seize drugs and guns from citizens without any accountability for such evidence. As a result, there were few safeguards in place to stop deputies from taking unmarked evidence, such as firearms, for their personal use. Because evidence could only be officially disposed of after being assigned an OCA Number, the Drug Unit often disposed of evidence offsite without creating an official record.

23.     In addition to offsite disposition of unmarked evidence, the WCSO Drug Unit sometimes disposed of unmarked guns and drugs by moving them into the Evidence Room without ever opening an OCA number or marking the drug evidence. This was possible because WORTH, COX, and at least one other member of the Drug Unit had access to keys and swipe cards that allowed them after-hour entry into official Evidence Room. Using such access to the Evidence Room, Drug Unit deputies commingled unmarked drugs into the basket used by Evidence Techs to hold drug evidence from closed cases being stored for destruction. This was possible because WCSO kept drug evidence from closed cases in an industrial-size prison laundry basket that had no cover.

24.     As to unmarked firearms, Drug Unit deputies sometimes disposed of the guns by accessing the Evidence Room after hours and stacking the unmarked firearms in an abandoned shower stall. Based on this practice, by 2022, WCSO's

9

Evidence Techs were unable to ascertain the source of more than 110 firearms located in the Evidence Room without OCA Numbers.

25.    In approximately 2014, COX began a relationship with a significant Goldsboro drug trafficker ("Drug Trafficker One") who COX referred to as a CI.[5]   In 2015, COX attempted, without success, to form a relationship with a second high-level drug trafficker ("Drug Trafficker Two").

26.    Sometime during the period from late 2014 to late 2015, COX instructed Drug Unit Subordinate One to make a digital copy of COX's girlfriend's cell phone (often referred to as "dumping" a cell phone).  Drug Unit Subordinate One's duties at WCSO included using law enforcement software to "dump" cell phones.  On December 7, 2015, COX, having already had his own girlfriend's cell phone "dumped," texted the following relationship advice to another deputy in the Drug Unit: "If she [the deputy's wife] wants this to work.  She needs to let you dump her phone."   In discussing his use the cell phone information improperly dumped from his girlfriend's phone, COX stated as follows: "Not trying to be negative.  But they can come up with some shit to tell u.  That's for sure.  [Girlfriend's name redacted] lied to me abt it for awhile until I had her by the balls."

27.    In January 2016, Drug Unit Subordinate One was having a dispute with COX.  On January 10, 2016, Drug Unit Subordinate One sent the following text to COX in connection with the dispute: "Worst thing is a good good buddy that I dumped

---

[5]WCSO records do not reflect a CI file ever having been opened by COX for Drug Trafficker One.  A review of the "buy money" ledgers shows some small payments having been made to Drug Trafficker One.

[girlfriend's name redacted] cell phone for anonymously is stabbing me in the badck! Now fix this shit before I do!"

### D. COX's conspiracy to provide protection and sensitive law enforcement information to drug traffickers.

28. In early 2016, WORTH was promoted to Captain in charge of Support Services, the Drug Unit, ACE teams,[6] DWI teams, and the SWAT team. COX was promoted to the head of the Drug Unit and received permission to move the entire unit from the Annex to an unsecured offsite location in a vacant storefront on U.S. Highway 70 in Goldsboro ("Highway 70 Offsite"). The Highway 70 Offsite location had neither an alarm system, nor a secure evidence room. Two sets of gym-type lockers ("Lockers") were moved to the Highway 70 Offsite location for use by the Drug Unit in unofficially holding evidence, including drugs and firearms. As noted above, this practice violated numerous WCSO policies.

29. In June 2016, Drug Trafficker Two and his longtime girlfriend were arrested by COX. Notwithstanding these arrests, Drug Trafficker Two still refused to associate with COX.

30. In approximately late 2016, the WCSO began an internal investigation of allegations that Drug Unit Subordinate One was being paid by a methamphetamine dealer to provide advance warning of planned arrests and searches. At the request of WCSO, the North Carolina State Bureau of Investigation assigned an agent to assist in the investigation. Upon learning about the

---

[6]By 2016, WCSO had more than one ACE team in place.

investigation, COX went to WCSO management and vouched for Drug Unit Subordinate One. Soon thereafter the investigation was closed.

31.     On March 16, 2017, COX detained Drug Trafficker Two in possession of four ounces of powder cocaine. At this point, Drug Trafficker Two agreed to provide information to COX. Pursuant to his practice, COX initially thwarted any prosecution of Drug Trafficker Two by not opening an official OCA case.

32.     On March 20, 2017, a WCSO drug unit detective who was then serving as a task force officer ("TFO") with the Drug Enforcement Agency[7] ("DEA") requested a copy of the interview relating to Drug Trafficker Two's arrest for use in the DEA's investigation of the source of the drugs sold to Drug Trafficker Two. In response, COX instructed a subordinate to open a case, write a report, and move four ounces of cocaine to the Evidence Room. On April 11, 2017, close to a month after the original traffic stop, a Drug Unit deputy formally opened a case on the March 16 seizure and moved 126 grams of cocaine from the Highway 70 Offsite location to the Evidence Room. Notwithstanding the opening of a case file on the March 16 drug seizure, formal charges were never brought against Drug Trafficker Two.

33.     Drug Trafficker Two initially provided some information to COX about a large amount of drug proceeds being held at a local drug dealer's stash house. COX provided this information to Drug Trafficker One and proposed that Drug Trafficker One conduct a robbery of the stash house. Although Drug Trafficker One surveilled

---

[7]WCSO had a long history of history of having a member of its Drug Unit serve as a TFO with the DEA. As such, members of WCSO's Drug Unit were directly involved in cases worked by DEA in Wayne County.

the stash house, he chose not to do the robbery. After WCSO seized more than $50,000 in drug proceeds from the location, COX teased Drug Trafficker One about missing the opportunity to steal the money.

34.     No later than mid-2017, COX began conspiring to assist Drug Trafficker Two's drug operation. COX accomplished this by, among other things, providing protection under the ruse that Drug Trafficker Two was a CI and passing sensitive law enforcement information to Drug Trafficker Two.

35.     In approximately May 2017, COX approached Drug Trafficker Two about conducting a home invasion of the Peele Road Residence, which was thought to contain a large amount of drug proceeds. On May 18, 2017, COX texted Drug Trafficker Two a CJ Leads[8] photograph of the Peele Road Drug Dealer. On June 8, 2017, COX texted Drug Trafficker Two a pin drop providing the exact location of the Peele Road Residence and stated "[t]hat's the mans [sic] house." COX further explained that it was a house, not a trailer. Drug Trafficker Two responded "Oh I'm going to pay em visit." On June 9, 2017, Drug Trafficker Two texted COX "I went out there n scoped it out." Just ten days later, a violent home invasion occurred at the Peele Road Residence. Although COX had knowledge of Drug Trafficker Two's involvement in the violent home invasion, COX withheld such information from the WCSO detective assigned to the case. The WCSO detective investigating the home

---

[8]CJ Leads, which stands for Criminal Justice Law Enforcement Automated Data Services, is a secure database for use solely by law enforcement. The photograph that COX texted to Drug Trafficker Two also contained the Peele Road Drug Dealer's address, driver's license number, and whether their license was suspended.

invasion stated that had COX provided him with such information, Drug Trafficker Two would "have become a definite person of interest, if not a -- a lead suspect."

36. On June 26, 2017, COX observed Drug Trafficker Two purchase two ounces of cocaine from a target whose home was being watched by COX as part of a DEA operation. COX should have arrested Drug Trafficker Two for possession and trafficking in two ounces (56 grams) of powder cocaine. Instead, COX pulled over Drug Trafficker Two and explained that the drugs would need to be seized because the DEA was targeting Drug Trafficking Two's supplier. Drug Trafficker Two complained that he would be out the $2,000 used to buy the drugs. In response, COX stated that he would use WCSO "buy money" to reimburse Drug Trafficker Two and make it appear as if the situation had been a Controlled Purchase, which it was not. In addition to providing Drug Trafficker Two with $2,000, COX also provided Drug Trafficker Two with a $200 CI fee.[9]

37. By the end of 2017, the Goldsboro Police Department ("GPD") drug supervisors considered Drug Trafficker Two to be one of the largest drug dealers in Goldsboro and planned to target him for investigation. COX, much to the frustration of GPD, was able to block such investigation. As a result, GPD began to view Drug Trafficking Two as "untouchable" due to his relationship with COX.

38. On September 18, 2017, COX texted the assistant district attorney and requested that the June 2016 charges against Drug Trafficker Two's longtime

---

[9]WCSO records do not reflect a CI file ever having been opened by COX for Drug Trafficker Two or any reports pertaining to a Controlled Purchase having been conducted by Drug Trafficker Two. A review of WCSO's "buy money" ledgers reflect a single $200 payment having been made to Drug Trafficker Two in September 2018.

girlfriend be dismissed. When the assistant district attorney responded that the charges were not going to be dismissed, COX texted that he would "just talk to u later abt it." The charges against Drug Trafficker Two's longtime girlfriend were ultimately dismissed in December 2019.

39. On April 26, 2018, Drug Trafficker One's image was captured on a video camera entering a drug stash house in Goldsboro with a handgun in his right hand and then exiting the house minutes later. After Drug Trafficker One drove away from the house, a drug dealer is shown on the video limping out of the house with a gunshot wound in his leg and then sitting on the front patio to await an ambulance. Following the shooting, Drug Trafficker One contacted COX and requested that COX let Drug Trafficker One know if law enforcement was looking for him in regard to the shooting. Drug Trafficker One was charged with the shooting and arrested on May 5, 2018, in Fayetteville. The charges were dismissed on May 17, 2018, after the victim signed an affidavit stating that Drug Trafficker One had not shot the victim.

40. In mid-2018, the WCSO command staff became aware that COX intended to retire later in the year. In approximately July 2018, WCSO's DEA-TFO agreed to step down from his TFO position and become head of the Drug Unit. Although management refused to allow the new Drug Unit head to replace several of COX's subordinates in the Drug Unit, he was allowed to reach out to GPD about creating a joint task force to fight drug crimes in Wayne County. GPD had avoided working in a task force with WCSO because GPD believed COX was improperly protecting Drug Trafficker Two. However, with COX no longer in charge of the Drug

15

Unit, GPD agreed to join the task force and share the rental expense for an offsite office.

41.    Effective July 1, 2018, the Drug Unit moved from the Highway 70 Offsite location to a condominium in a small business park at 696B Spence Avenue in Goldsboro ("Spence Avenue"). As was the case with the Highway 70 Offsite location, the Spence Avenue site had neither a security system, nor a secured evidence room. A set of personal lockers used at the Highway 70 Offsite location was moved to the Spence Avenue office.

42.    During the final months before COX's retirement on November 1, 2018, COX was reassigned from the Drug Unit to work in training new ACE deputies. With COX no longer in the Drug Unit, GPD convinced the new head of the Drug Unit to pursue Drug Trafficker Two. Consequently, on September 27, 2018, GPD and WCSO executed dual search warrants on houses used by Drug Trafficker Two for drug trafficking in Goldsboro. At the time of the search, GPD arrested Drug Trafficker Two and seized his cell phone.

43.    After Drug Trafficker Two was released on bond, he contacted COX and was instructed to come to COX's home in Walnut Creek. At the time, COX (who was still a sworn WCSO deputy) was hosting a cookout with the head of WCSO's Patrol Unit and a defense attorney ("Defense Counsel"). Upon arriving at COX's home, Drug Trafficker Two, COX, and the Defense Counsel discussed the search warrants. COX then arranged for the Defense Counsel to handle Drug Trafficker Two's case. Following this meeting, COX communicated with the GPD drug unit and demanded

16

that they turn over Drug Trafficker Two's phone to WCSO. The head of the GPD drug unit intervened and refused to turn over the phone to WCSO.

44. On November 5, 2018, just days after his retirement, COX and Drug Trafficker Two texted about which witnesses the Defense Counsel should call at an upcoming suppression hearing relating to GPD and WCSO's dual search warrants.[10]

45. On February 15, 2019, Drug Trafficker Two texted COX a photograph of 14 oxycodone pills stamped "K8" and texted "[t]here." COX quickly responded "[t]hanks," to which Drug Trafficker Two responded, "No problem it's 15." The reference to 15 was a reference to the price per pill.

46. Five days later, on February 20, 2019, Drug Trafficker Two shot a cooperating informant who the joint WCSO-GPD task force had planned to use to make buys from Drug Trafficker Two. The wounded CI survived, called 911, and informed the 911 operator that he had been shot by Drug Trafficker Two. A WCSO Drug Unit detective arrived at the hospital at approximately 10:26 p.m. to check on the victim. According to the WCSO detective's report, approximately 90 minutes later, at 12:02 a.m., the detective received a call from COX, who had then been retired for several months. According to the detective, COX stated, "I heard they are saying [Drug Trafficker Two] shot somebody. . . . [Drug Trafficker Two] didn't shoot nobody he has been texting and facetiming me all night during the Carolina Duke basketball game. . . . he wasn't at Solcumb and Mulberry."

---

[10]The charges against Drug Trafficker Two were dismissed on January 9, 2019.

47.     Rather than assist WCSO/GPD in locating Drug Trafficker Two, COX texted Drug Trafficker Two on February 21, 2019, and directed him to "[g]o on up to the shop.  [A worker] is gonna fix u."  COX then texted the following to Defense Counsel at 8:33 a.m., on the morning of February 22, 2019:

> [Drug Trafficker Two] has attempted murder warrant.  It's bullshit. . . .  [Drug Trafficker Two] has got like 1500 cash if you will meet him at the magistrate office just to try and get his bond at 200,000.  He said he can make bond if it's 200,000.  Let me know if you can help him.

Defense Counsel instructed COX to inform Drug Trafficking Two "to lay low until I call him and I'll meet him at my office."  COX responded six minutes later that he had "just told him [Drug Trafficker Two]."

48.     On March 1, 2019, Drug Trafficker Two texted the following to COX: "My bruh for life . . . fuck who don't like it."  On March 3, 2019, Drug Trafficker Two texted COX as follows, "I got you . . . ."  COX responded as follows, "I know u do.  U know I have your back through anything.  There ain't many people you can trust in life.  But ur my bro."

49.     On June 27, 2019, Drug Trafficker Two texted the following to COX, "[t]hey got our boy [Drug Trafficker Three] smh" and then texted "[f]ucking wit that ICE."[11]  On June 29, 2019, COX texted the following to Drug Trafficker Two:  "Tell [Drug Trafficker Three] I still ain't found out nothing yet.  That's why I won't answer.  Don't wont [sic] to waste his minutes."

---

[11]ICE is a common term used to describe crystal methamphetamine, which is a highly pure form of methamphetamine.

50.     On July 10, 2019, COX was interviewed by the Bureau of Alcohol, Firearms, Tobacco and Explosives ("ATF") regarding the alibi that he provided for Drug Trafficker Two in regard to the February 20, 2019 shooting of a WCSO CI.  COX stated that he had not heard from Drug Trafficker Two during the three months following the CI shooting.  However, text message records show that COX and Drug Trafficker Two exchanged more than 80 text messages during this three-month period.

51.     On July 11, 2019, COX and Drug Trafficker Two texted about whether Drug Trafficker Three could get the district attorney to reduce his bond to $75,000.  COX responded that Drug Trafficker Two should put some money on Drug Trafficker Three's canteen account at jail and COX would take the amount out of what Drug Trafficker Two owed COX.

52.     On December 4, 2019, Drug Trafficker Two was arrested by WCSO in possession of two kilograms of powder cocaine.  After the arrest, Drug Unit Subordinate One drove Drug Trafficker Two back to the Annex to be interviewed. During the drive to the Annex, COX (who had been retired for more than a year) called Drug Unit Subordinate One.  Drug Unit Subordinate One did not answer the call.

53.     Drug Unit Subordinate One was assigned to make a digital copy of Drug Trafficker Two's seized cell phone using Cellebrite software.  A copy of the phone dump was later provided by WCSO to GPD.  The following month, after learning that

19

Drug Trafficker Two's cell phone had been dumped by WCSO, COX texted the following to Drug Unit Subordinate One:

> I know you dumped [Drug Trafficker Two's] phones and have read all the text messages. Why didn't you say anything abt when I talked to you earlier. I really don't give a shit. Cause there ain't nothing on any of his phones that would get me in trouble. But damn!! Why is everyone so secretive?? I hope somebody comes to speak to me. Cause I will blow the roof off that dumb ass office!! Thanks for looking out.

54. After receiving no response from Drug Unit Subordinate One, COX sent the following text to Drug Unit Subordinate One:

> I knew something was up when you said you were going to help me at the shop and you never came or called. You know if it weren't for me you wouldn't even be there now. They wanted you gone. And thought you were dirty and I stood up for you. In fact I got fired because of the whole situation. I had your back to the end. Investigate all y'all want to. There is nothing I have said or done that is remotely illegal. Lose my number. You don't ever have to worry abt talking to me again. YOU LIAR.

55. On January 7, 2020, a close relative who lives at COX's residence ("Close Relative") texted as follows, "You think [Drug Trafficker One] could get me something in the next few days? I've got cash." On January 16, 2020, the Close Relative texted[12] COX as follows:

> Close Relative:    Not one thing in the mail box not even mail.
>
>                 You're gonna have to threaten that sorry N[****]r!
>
>                 I'm sooooo pissed.

---

[12]The Government has replaced certain letters in the text with asterisks.

56.     On February 5, 2020, COX texted Drug Trafficker Two's girlfriend and agreed to put some money on Drug Trafficker Two's jail canteen account.

57.     On February 5, 2020, COX and the Close Relative had the following text conversation:

| | |
|---|---|
| Close Relative: | When is he coming? |
| COX: | He's still looking. Just texted me. |
| Close Relative: | I thought he had them. |

After this text exchange, COX and Drug Trafficker One attempted to call and/or text each other at least 30 times during the remainder of February 5, 2020.

58.     On March 5, 2020, COX texted the following to Drug Trafficker Two's girlfriend: "Send me the link again to put money on his canteen."

59.     On November 3, 2020, COX texted the following to Drug Trafficker One, "Happy bday n[***]a."[13] By this date, the ATF was in the midst of a federal investigation of Drug Trafficker One and was able to view the text as it arrived.

60.     On December 4, 2020, COX contacted a WCSO detective and had them use a law enforcement database to run a Kentucky license plate number. The detective responded that they were having another WCSO employee run the plate. Within four minutes of his initial text, COX was provided with the name and address of the person to whom the plate was registered.

---

[13]The Government has replaced certain letters in the text with asterisks.

61.     On January 24, 2021, COX texted Drug Trafficker One about getting some percocet/oxycodone pills. Drug Trafficker One then began communicating with his suppliers to set up a deal for COX. One contact ("Pill Supplier One") called and responded that he could get some pills from another drug dealer ("Pill Supplier Two"). Pill Supplier One further explained that he needed to keep some of the inventory, but could spare about 10 pills.

62.     On January 25, 2021, Drug Trafficker One called and informed COX of the identities of the two suppliers from whom they would get the pills and explained that the available supply may be limited to 10 pills at $15 per pill. Drug Trafficker One also explained that COX would likely need to split the number of pills with Drug Trafficker One. COX agreed to the deal.

63.     On January 28, 2021, COX and Drug Trafficker One had the following phone conversation:

| | |
|---|---|
| Drug Trafficker One: | Hey, 15 – 5 for 8 a piece. |
| COX: | Do what? |
| Drug Trafficker One: | 15 – 5 for eight a piece. They got 15 – 5, but they want 8 piece. |
| COX: | Yeah, that's fine, get em. |
| Drug Trafficker One: | Yeah he wants em, get em for him. |
| Drug Trafficker One: | Okay, I'm gonna call you right back. |
| COX: | Alright. |

Drug Trafficker One agreed to deliver the pills to COX's home mailbox. A review of data from a GPS device that had been placed on Drug Trafficker One's car[14] shows Drug Trafficker One driving to the Walnut Creek subdivision where COX resided.

64.     On January 29, 2021, Drug Trafficker One texted COX and asked, "Do you want these other 15 same as last night." COX replied that he did and, after a number of additional text exchanges, they agreed that the pills would again be delivered to COX's home mailbox. The pills were delivered to COX's mailbox at approximately 9:41 p.m.

65.     On February 3, 2021, at 8:24 p.m., Drug Trafficker One called COX and stated he had access to approximately 40-60 ten milligram pills for $11 per pill. Drug Trafficker One informed COX that the pills would be supplied by Pill Supplier One and another drug trafficker with whom COX was also acquainted ("Drug Trafficker Four"). During the call, COX could be heard speaking to a female in the background and then agreeing to purchase 20 ten milligram pills for $11 per pill.

66.     Later on February 3, 2021, federal law enforcement set up surveillance of COX's residence in Walnut Creek and of Drug Trafficker One as he drove to Kinston to pick up the pills. Drug Trafficker One was observed traveling from Kinston to COX's residence and dropping off the pills into COX's mailbox at approximately 9:39 p.m. At approximately 10:03 p.m., Drug Trafficker One texted COX stating, "It's there." At approximately 10:11 p.m., law enforcement observed a

---

[14]Pursuant to a federal court order, the ATF had placed a GPS device on Drug Trafficker One's car to track his movements while driving the vehicle.

male in a hoodie walk out of COX's garage to the mailbox, retrieve the pills, and reenter the garage.

67.     On February 5, 2021, Drug Trafficker One texted COX as follows, "Got like 20 more 10's let me know something." COX agreed to purchase the pills and texted about meeting in person for the handoff of the drugs. During a telephone conversation later that day, COX noted that Drug Trafficker One's phone had poor reception and advised Drug Trafficker One to get both a new phone and a new number.

68.     On February 20, 2021, Drug Trafficker One texted COX that he had obtained a second phone and provided COX with the new number.

69.     On February 25, 2021, at 8:24 a.m., Drug Trafficker One used his original cell phone to call and alert COX that a GPS device was found on his car during an oil change. Referencing Drug Trafficker One's use of the car to make the recent drug deliveries to COX's home, he stated as follows: "You know I've done been out that way a couple of times."

70.     At no point in the conversation did Drug Trafficker One indicate that he wished to return the GPS device to law enforcement. Instead, Drug Trafficker One stated, "I just ripped it [GPS Tracker] off, I got it in my hand right now. I wish these bitches [law enforcement] would pull up and come get it so I could cuss their ass out." Drug Trafficker One then stated as follows: "Go look on my snap [Snapchat] you still friends with me on Snap? I just put it [a photo of the GPS tracker] when I ripped it off and everything."

71.     After receiving the call from Drug Trafficker One, COX immediately tried to call the head of the WCSO Drug Unit and then Drug Unit Subordinate One. Drug Unit Subordinate One called back at 8:32 a.m., and spoke to COX for 1:48 seconds.  During the call, Drug Unit Subordinate One advised COX that the GPS device was not tied to any investigation out of Spence Avenue, which excluded WCSO, GPD, and DEA.  At 9:31 a.m., the Drug Unit head called COX back and spoke with him for 1:42 seconds.  Based on his calls to members of the WCSO Drug Unit, COX correctly surmised that the GPS device was part of an ATF investigation.  At 9:58 a.m., COX called Drug Trafficker One's new phone and informed him that "it's got to be [Agent's Name Redacted] of the ATF."  Later in the conversation, COX again confirmed, "that's the ATF man."

72.     Drug Trafficker One then texted and called several of his drug associates, including Drug Trafficker Four and Pill Supplier One, to warn them about the GPS device.

73.     During a conversation with Drug Trafficker Two's girlfriend on March 5, 2021, COX stated as follows: "I fuck with [Drug Trafficker One] a little bit too, I've always fucked with [Drug Trafficker One] a little bit. . . . [Drug Trafficker One's] always been a friend of mine."  COX then admitted that Drug Trafficker One was a source for COX to get percocet pills and that Drug Trafficker One had come to his house at least twice in the weeks leading up to the discovery of the GPS tracker.  COX also stated that he had advised Drug Trafficker One not to return the GPS tracker to law enforcement.

74.     On March 12, 2021, Drug Trafficker Two, who was incarcerated on federal charges resulting from his December 4, 2019 arrest, contacted his girlfriend by phone and requested that she contact "MC" for him. Drug Trafficker Two's girlfriend then traveled to the back entrance of EEE and handed her cell phone to COX. During the conversation between COX and Drug Trafficker Two, COX noted that he could do nothing to help with the federal case, but as to any remaining state charges against Drug Trafficker Two "they can't do nothing with that mess without me and I ain't never going back up there."

75.     Drug Trafficker One was arrested by the ATF on March 17, 2021. Following his arrest, Drug Trafficker One made a recorded call to COX and offered to sell him painkillers. COX responded as follows: "I don't know man. I'll hit you back though."

76.     In late May 2021, more than two and a half years after COX's retirement, he was still able to have his contacts within the WCSO use sensitive law enforcement databases to provide COX with information. For example, on May 24, 2021, COX texted WORTH a name and asked the following: "Can you check and see if his license are still revoked." On May 25, 2021, WORTH responded that the license was "[s]uspended."

### E.     COX and WORTH conspire to defraud Wayne County by means of false and fraudulent pretenses, representations, and promises.

77.     As noted above, WORTH was promoted to Captain in charge of Support Services in 2016 and became responsible for coordinating and vetting bids from

vendors on various WCSO contracts. In this position of trust, WORTH was required to comply with the procurement requirements set forth in the *Manual*. The *Manual* was adopted to ensure that county business was conducted ". . . with fairness and dignity and to demand honesty and truth in buying and selling." *Manual* at pg. 7 (§II(B)(8)).

78. As to law enforcement vehicles, WORTH was required to submit documentation to County Purchasing for approval of the purchase of new vehicles and the cost of having the new vehicles "upfit" for law enforcement work. "Upfit" refers to the process of installing aftermarket equipment to customize a newly purchased vehicle for law enforcement work. The type of equipment typically installed includes, without limitation, lights, sirens, radios, other communication equipment, law enforcement agency decals, various brackets to hold computers and other equipment, partitions, push bumpers, and customized front center consoles/adjustable arm rests.

79. Although WORTH was obligated to promote Wayne County's financial interest over his own, the *Manual* gave WORTH discretion to select vendors for jobs costing less than $1,000.[15] In this category, a vendor's invoice was sent by WCSO to County Finance, which mailed the check directly to the vendor.

80. For items costing between $1,000 and $2,499, WORTH was required to obtain three independent quotes and award the contract to the lowest bidder.

---

[15]Tax was not included in determining bid thresholds, but labor and freight charges were included.

27

Case 5:23-cr-00260-M-RN   Document 40   Filed 10/18/23   Page 27 of 51

Although the three quotes were not required to be submitted to County Finance, WORTH was required to keep copies on file in the event County Finance or County Purchasing wished to review them. Checks for such invoices were processed by County Finance and mailed directly to the vendors.

81.     For equipment costing $2,500 or more, WORTH was not allowed to award a job until a "Purchase Order" was approved and signed by County Purchasing and County Finance. To commence this process, WORTH was required to obtain three[16] independent quotes from vendors -- taking care to ensure that each quote was "on the same item or specifications." *Manual* at III(C)(2). Once three independent quotes were obtained, WORTH was required to prepare a one-page "Memorandum of Award" providing a description of the item to be purchased, the identity of the three vendors, and a list the three quotes (starting with the lowest quote). WORTH was then required to submit the Memorandum of Award, the three itemized quotes, and a requisition coversheet to County Purchasing. Because of the volume of purchasing packages received on a daily basis, County Purchasing did not have the resources to do a detailed review of each package or to call vendors to confirm the validity of the quotes provided. Instead, County Purchasing relied on the honesty and integrity of various departments and offices that submit the documentation, including WCSO.

82.     After County Purchasing confirmed with County Finance that sufficient money remained in WCSO's budget to cover the proposed purchase, a Purchase Order

---

[16]In limited circumstances, the *Manual* provided exemptions from the three-quote rule if an item was only available from a sole supplier or in the event of public exigency. Such exceptions required written pre-approval by County Purchasing.

was prepared and signed by County Purchasing and County Finance. It was only after the Purchase Order was approved that WCSO was authorized to have the work done by the winning vendor. As was the case with the other categories, County Finance would pay the final invoice by mailing a check directly to the vendor.

83. With regard to any attempt to structure quotes to avoid bid threshold requirements, the *Manual* states as follows:

> D. No Evasion
>
> No contract may be divided to bring the cost under bid thresholds or to evade any requirements under this policy or state and federal law.

*Manual* at §XXI(D).

84. As to pricing information, the *Manual* clearly dictates that government officials "[n]ever discuss one vendor's pricing and delivery terms with another vendor. This may lead to unfair competition." *Manual* at § VIII(K). The *Manual* further states that "no additional charges should be added to the order" once the purchase is authorized. *Manual* at §VIII(J).

85. As noted above, COX began operating EEE in 2003, and WORTH worked for EEE from 2006 to at least mid-2021. Historically EEE obtained equipment used to perform "upfit" installations from West Chatham Warning Devices ("West Chatham"). West Chatham, which has branches in a number of cities, was based in Savannah, Georgia. West Chatham provided "upfit" installation to large law enforcement entities (often involving hundreds of cars per contract) and also sold "upfit" equipment to small retail operations such as EEE. A West Chatham's sales

representatives ("Sales Rep") was assigned the EEE account and worked the account for more than a decade.

86.     In approximately 2016, COX remarried and moved EEE to a commercial building on West Grantham Street in Goldsboro.  COX also moved with his new wife to an upscale development in Goldsboro named Walnut Creek.

87.     WCSO purchased its Dodge and Ford vehicles from Performance Automotive in Clinton, North Carolina.  The North Carolina Sheriff's Association had selected Performance Automotive to provide vehicles and "upfit" services to law enforcement agencies in North Carolina at pre-negotiated prices.  As a result, Performance Automotive had created a website containing quotes for "upfit" packages for law enforcement vehicles.  WORTH could access the website using his WCSO email and a password.  An advantage of using Performance Automotive for both the vehicle purchase and "upfit" was that the vehicle would be delivered to WCSO fully ready to be used for law enforcement.

88.     Notwithstanding the potential conflict of interest, WORTH continued working for EEE during his entire tenure as head of Support Services.  Due to WORTH's position, he and COX were able to fraudulently manipulate Wayne County's bid process to financially benefit COX and WORTH.[17]

    (i)    **WORTH and COX's fraudulent procurement practices in 2016.**

2016 Camera and Radio Installs

---

[17]From 2016-2020, Worth received at least $44,461 in pay from EEE.

89. On February 1, 2016, WORTH and COX communicated by text about a $29,055 balance owed for "all the camera and radio installs." After COX (who was head of the Drug Unit at this time) inquired about what kind of letter he would need to write "to get drug money moved," WORTH responded that he needed a quote on the radios since he would need to "pay it out of another account." WORTH then requested that COX "[b]ack date it [the quote] if you can."

### 2016 EEE's Unapproved "Upfit" on Eight Dodge Chargers

90. On August 9, 2016, WORTH and COX communicated by text regarding work already performed by COX, but not yet authorized by a Purchase Order. COX noted he was sending WORTH an invoice for work done on "the 8 chargers so you can go ahead and get a po." WORTH responded as follows: "Ok. Hopefully they will do a blanket PO. Does the invoice have to match the quote? Item for item." WORTH also asked COX the following: "Will you have to bill us for Whelen and give us Fenix?" COX responded that he had "already changed it and emailed it. But I can change it back."

### (ii) WORTH and COX's fraudulent procurement practices in 2017.

### 2017 Split Invoices on COX's Tahoe "Upfit"

91. On Friday, May 5, 2017, WORTH emailed the following to COX, "Need you to resend the bill for your Tahoe. Each bill needs to be under $2,500."[18] By

---

[18]In the same email, Worth provided a list of ten cars and a DWI Trailer on which EEE owed Worth pay for doing "upfit" installations. Of these vehicles, two related to WCSO contracts, including COX's Tahoe upfit.

splitting the bill in this manner, WORTH was able to avoid having to obtain a purchase order, which would have required submitting three quotes to County Purchasing. Later that same day, COX submitted split EEE invoices for the "upfit" of his assigned WCSO Tahoe. Pursuant to WORTH's instructions, COX split the $4,613.28 charge into two invoices for less than $2,500. The split invoices were received by WCSO on May 5, 2017, but WCSO backdated the approval dates to match EEE's backdated invoice dates (April 17 and April 26, 2017).

<u>2017 Split Invoices on Gun Lights</u>

92.     On Tuesday, May 8, 2017, WCSO received split invoices from EEE for the sale of eight TLR-1 gun lights.[19] EEE dated one invoice April 26, 2017, and the second invoice May 5, 2017.[20] The gun light invoices were divided in such a manner as to ensure each bill was under $1,000.[21] Although the invoices were stamped received by WCSO staff on May 8, 2017, Support Services backdated the approval dates to match EEE's backdated invoice dates (April 26 and May 5, 2017).

---

[19] On March 8, 2017, Worth sent the following email to COX: "Need 10 TLR 1 HL gun lights for Glock Pistols. Can you get them for me."

[20] EEE's practice, as most businesses, was to number invoices in increasing numerical order based on date of preparation. However, in the case of the split invoices for gun lights, EEE accidentally used number 2577 for the invoice dated April 26, 2017, and number 2573 for the invoice dated May 5, 2017.

[21] As noted above, the *Manual* requires purchases "for 1,000.00 – 2,500.00" to be supported by three independent quotes.

<u>2017 K-9 Insert Crates</u>

93.     On September 6, 2017, WCSO's K-9 Team supervisor sent the following email to COX at EEE, with copies to WORTH and WORTH's second in command in Support Services:

> Can you get me a quote for <u>three</u> Havis Shield K-9 Insert Crates for the new cars that are ordered? I'll get the other two from the internet somewhere and get them submitted for the PO. As soon as I get everything back I'll get you to order them.

As noted in the email, it was predetermined that EEE would get the contract, which was awarded to EEE on November 21, 2017. However, because the cost of the equipment exceeded $2,500, three quotes were required. To meet this requirement, the K-9 Team supervisor used two internet printouts, with fictitious information added for labor and freight costs, as the competing quotes.

94.     EEE did not pay WORTH on a weekly basis. Instead, he and COX typically negotiated an aggregate payment due after WORTH completed work on a number of cars. For example, on November 13, 2017, WORTH texted COX to negotiate pay owed to him for 20 vehicles on which he had done work for EEE.

### (iii)  **WORTH and COX's fraudulent procurement practices in 2018.**

<u>2018 K-9 Crate and Door Popper</u>

95.     On June 7, 2018, WORTH texted COX and ordered a K-9 crate and electronic door popper from COX without any attempt to comply with the three-quote requirement.

33

<u>2017 K-9 Insert Crates</u>

93.     On September 6, 2017, WCSO's K-9 Team supervisor sent the following email to COX at EEE, with copies to WORTH and WORTH's second in command in Support Services:

> Can you get me a quote for <u>three</u> Havis Shield K-9 Insert Crates for the new cars that are ordered? I'll get the other two from the internet somewhere and get them submitted for the PO. As soon as I get everything back I'll get you to order them.

As noted in the email, it was predetermined that EEE would get the contract, which was awarded to EEE on November 21, 2017. However, because the cost of the equipment exceeded $2,500, three quotes were required. To meet this requirement, the K-9 Team supervisor used two internet printouts, with fictitious information added for labor and freight costs, as the competing quotes.

94.     EEE did not pay WORTH on a weekly basis. Instead, he and COX typically negotiated an aggregate payment due after WORTH completed work on a number of cars. For example, on November 13, 2017, WORTH texted COX to negotiate pay owed to him for 20 vehicles on which he had done work for EEE.

### (iii)  **WORTH and COX's fraudulent procurement practices in 2018.**

<u>2018 K-9 Crate and Door Popper</u>

95.     On June 7, 2018, WORTH texted COX and ordered a K-9 crate and electronic door popper from COX without any attempt to comply with the three-quote requirement.

33

## 2018 Unapproved Boat Light

96.     On June 11, 2018, WORTH texted COX about an EEE invoice for work done on a WCSO boat. When WORTH realized that County Purchasing had approved $2,200 but COX planned to invoice only $1,400, the following conversation ensued:

COX:        Did we say 4 fusions and the two 60inch light bars on the boat. Is that it.

WORTH:      I think that is right.

COX:        How much did we say?

WORTH:      Don't remember think it is around1600.

COX:        That's what I thought. But it only comes to 1400.

WORTH:      That leaves about 800 for credit. Split.

COX:        So send it in at 1400.

WORTH:      Well the PO has about 2200 on it.

COX:        I can add another 100. It will prob be agrivatng [sic].

WORTH:      Ok. Is there anything else we could add?

COX:        Could put one of them golight spotlights on it for night rescues.

COX:        They are 599.00.

WORTH:      Just send it at 1500 and I will see what else we could use.

COX:        I think that light would be good for the night stuff. Same one we put on the mrap.

WORTH:      Ok. Get it. If they don't want it we will put it on something else.

34

97.     On September 26, 2018, COX texted WORTH and asked, "[d]o I need to Bill Travis['] car under a thousand?"  WORTH responded as follows, "[i]t would be easier on me."

### (iv)   WORTH and COX's fraudulent procurement practices in 2019-2021.

2019 Split Invoices on Truck Vault

98.     In approximately January 2019, COX installed a "Truck Vault" on the WCSO Sheriff's 2019 Chevrolet Tahoe.  A Truck Vault is a secure storage unit for the back of a vehicle, either in the trunk or back of an SUV.  The total charge by EEE was $2,147.92.  Because the amount in issue exceeded $1,000, the *Manual* required three independent quotes be obtained by WCSO for such a contract.  To avoid triggering the three-quote requirement, COX split the cost into two $1,073.36 invoices and then applied a 10% discount to bring each invoice to $972.96.

99.     In order to help WORTH conceal the fact that the split invoices actually related to only one truck vault, COX used different invoice numbers and dates. He dated invoice number 3318 as January 3, 2019, while invoice number 3202 was dated January 9, 2019.  WORTH approved both invoices and backdated his approvals to match the dates on COX's invoices (January 3 and 9, 2019).  Payment of the invoices was included in a larger[22] check written to EEE in the sum of $3,450.31.  This check,

---

[22]Due to the large number of invoices received from EEE, County Finance would often pay multiple EEE invoices in one check.

which was numbered 360750, was mailed by County Finance to EEE on or about January 17, 2019.

## 2019 Fictitious West Chatham "Upfit" Quote

100.    In September 2019, COX requested that the West Chatham Sales Rep provide him with a fictitious "upfit" quote for use by EEE in obtaining WCSO's "upfit" contracts. The Sales Rep agreed to prepare the fictitious quote in order to curry favor with COX, who she considered a friend and one of her valued retail clients. COX assured her that he was guaranteed to get the contract but stated that WCSO needed more than one quote. COX provided the Sales Rep with a copy of EEE's quote in order to assist the Sales Rep in preparing a higher West Chatham's quote. As a result, the Sales Rep was able to inflate the fictitious quote to ensure EEE's quote would win the contract.

101.    On September 16, 2019, the Sales Rep transmitted the fictitious quote from her work email account at West Chatham in Georgia, to COX's email account in the Eastern District of North Carolina. The bid, which was completely fictitious, provided an "upfit" quote of $5,063.35 per vehicle, including $1,000 for labor and $125 for freight. Although the fictitious bid was addressed to "Waynes Co Sheriff Office," the Sales Rep sent the bid to COX at EEE, rather than to WCSO. West Chatham never had direct contact with WCSO in connection with the fictitious quote.

102.    Because the Sales Rep was asked to provide a fictitious quote for a Dodge Charger, she prepared the quote to include prices for the following parts specific to Dodge Chargers: (a) "TAIL LIGHT FLASHER DODGE CHARGER"; (b) "VS-2500-

36

CHGR-1 Console 25" 11-19 Charger (pol pkg)"; and (c) "STINGER DS LED W/DC CHARGER."

<u>2019 Performance Automotive "Upfit" Quote</u>

103.     The third bid used by WORTH to justify WCSO's award of 14 "upfit" contracts to COX was taken from the secure website of Performance Automotive, the car dealership that provided WCSO with many of its new vehicles.  WORTH obtained Performance Automotive's quote from a password-protected website and made a practice of sharing this information with COX.  WORTH obtained a one-page printout of a quote from Performance Automotive for the "upfit" of a 2019 Dodge Charger and used it throughout the year, whether the "upfit" contract was for a Dodge Charger or another type of vehicle.

104.     With prior knowledge of the competing quotes that would be submitted to County Purchasing, COX was able to ensure that EEE's quote was the lowest.  If COX needed to reduce EEE's quote, he would often do so by only bidding on a subset of the parts necessary for a complete "upfit" or by reducing EEE's charge for labor. WORTH and COX would then arrange for EEE to be paid for such parts and labor in follow-up invoices of less than $1,000.

<u>2019 WCSO 14 "Upfit" Contracts</u>

105.     In 2019, WORTH used the West Chatham and Performance Automotive quotes to justify the award of 14 "upfit" contracts to EEE.  Although the quotes covered parts specific to a Dodge Charger, the awards related to four Dodge Trucks

37

and two Chevy Tahoes.  The following is a summary of the manner in which Wayne
County paid the invoices:

> (a) <u>Four Dodge Truck upfits</u> – Wayne County paid EEE the
> sum of $17,587.83 by mailing Wayne County check
> number 374717 to EEE on or about November 21, 2019.

> (b) <u>Eight Dodge Charger upfits</u> - Wayne County paid EEE
> the sum of $35,175.66 by mailing Wayne County check
> number 376372 to EEE on or about December 31, 2019.

> (c) <u>Two Chevy Tahoe upfits</u> – Wayne County paid EEE the
> sum of $8,782.44 by mailing Wayne County check
> number 379451 to EEE on or about March 5, 2020.

<u>2020 False Description of Equipment Purchase</u>

106.    On April 29, 2020, WORTH texted COX and directed him to prepare a
false invoice by stating as follows, "[m]e and Brian got a phone holder each.  Will you
bill as a pair of shoes."

<u>2020 Backdating of Quote</u>

107.    On June 4, 2020, WORTH sent the following text instructing COX to
backdate an EEE invoice: "Estimate number 1247.  Change date to 2/20/2020."

<u>2020 Improper Sharing on Performance Automotive's Quote</u>

108.    On August 31, 2020, COX texted WORTH as follows: "You got a list of
equipment or either your password to log in or signon."  WORTH responded as
follows:

> performancepolice.com

> chris.WORTH@waynegov.com

> *******

[Password has been redacted for purposes of Superseding Indictment].

109. Because WORTH had corruptly provided COX with access to Performance Automotive's pricing, COX realized that Performance Automotive's quote would be lower than EEE's quote. In order to rig the process in his favor and beat Performance Automotive's quote, COX reduced EEE's line item charge for "HAV-C-ARM-103 – Adjustable Flip Armrest" to zero. This allowed EEE to beat the Performance Automotive quote by $31.05. In order to recoup the cost of the armrests, COX would later present WCSO with a separate bill for nine of the armrests.

### 2020 Fictitious West Chatham Quote

110. On September 16, 2020, at 7:57 a.m., COX sent the West Chatham Sales Rep a copy of EEE's competing bid for the 2020-2021 WCSO "upfit" contracts. The Sales Rep used this information to ensure that the fictitious West Chatham quote was higher than EEE's bid. At 9:07 a.m., a copy of the fictitious quote was emailed from the Sales Rep in Georgia, to COX's email account in the Eastern District of North Carolina. At 10:44 p.m. on that same day, COX forwarded the fictitious West Chatham quote from his Yahoo email account to WORTH's WCSO email account.

### 2020 Award of 11 "Upfit" Contracts to EEE

111. COX and WORTH corruptly used the West Chatham and Performance Automotive quotes to justify the award of 11 "upfit" contracts to EEE in 2020-2021. Although the quotes were based on parts for a Dodge Charger, the upfit awards were for nine Dodge Durangos and two Chevy Tahoes. The following is a summary of the manner in which Wayne County paid the invoices:

39

(a) <u>Nine Dodge Durangos upfits</u> - Wayne County paid EEE the sum of $40,735.32 by mailing Wayne County check number 14360 to EEE on or about October 31, 2020.

(b) <u>One Chevy Tahoe upfit</u> – Wayne County paid EEE the sum of $4,396.96 by mailing EEE Wayne County check number 15484 to EEE on or about December 7, 2020.

(c) <u>One Chevy Tahoe upfit</u> – Wayne County paid EEE the sum of $4,526.15 by mailing Wayne County check number 21789 to EEE on or about May 11, 2021.

<u>EEE's Added Charges for the 2020 "Upfit" Contracts</u>

112.  On April 26, 2021, in order to recoup the price of the armrest installations that COX had removed from EEE's quote on the nine Dodge Durangos in 2020, EEE submitted an invoice in the sum of $968.22 for nine "HAV-C-ARM-103 -- Adjustable Flip Armrest." The charge before tax was $968.22, which allowed WORTH to avoid having to document three quotes. On the same date, COX sought payment for the labor involved in connection with the decals on the nine Durangos. To avoid documentation requirements, COX split the cost of the decal-related expenses into $900 and $450 invoices. Payment of the armrests and decal installment invoices were made by Wayne Count check number 21562, which was mailed to EEE on April 30, 2021.

<u>2021 Inside Information Regarding Performance Automotive</u>

113.  On June 28, 2021, WORTH and COX engaged in the following discussion regarding difficulties EEE might encounter in competing with Performance Automotive for an upfit contracts:

COX:        Do you know what performance price is yet[?]

40

| WORTH: | I guess they are no longer listing it on website. It says Dana Safety [an "upfit" subcontractor] will start with them in their facility on July 1st. May have to get quote from Dana. |
|--------|---|
| COX: | Dang. That will be low. |
| WORTH: | I may have to get one [a competing quote] from somewhere else. |

114.    In approximately late 2021, WORTH was promoted to Major, the head of the Drug Unit was promoted to Captain in charge of Support Services, and Drug Unit Subordinate One was promoted to head of the Drug Unit.

### F.    COX's false statements to the Federal Bureau of Investigation ("FBI") during the course of a federal investigation.

115.    On September 21, 2021, COX had two telephone conversations with an FBI agent regarding questions that COX had about federal grand jury subpoenas that had been served on EEE. During the conversations, the FBI agent identified himself as an FBI agent and then, more specifically, as the "admin" agent responsible for the grand jury subpoenas. COX stated that he had been "over the drug squad for a long time. I know how all this works. I've been to federal court. I've put people in federal prison. I know how the processes work."

116.    In reference to EEE's bid process with WCSO, COX stated as follows:

Chris [WORTH] would always get my quote first. . . . And then go and get the other ones so that there was no question of, "Well did Chris show him what the quotes were so he could bid lower." No, never, ever.

117.    Later in the conversation, COX provided further elaboration on the bid process at WCSO:

I've have nothing to hide there, nothing. So this is what I was trying to get at earlier about the bidding process is . . . I have no control over who gets awarded these bids. I provide a quote. That is the end of it. Then I'm called and said, "Hey, uhm, you, you know, you got the bid. Go ahead and order the equipment."

118.   At one point in the conversation, COX falsely stated that when Drug Trafficker One called him about the GPS tracker, Drug Trafficker One stated as follows, "Well if it's the Sheriff's Office, let them know I got it and I'll give it back."

119.   COX also described a March 2021 call during which Drug Trafficker One offered to sell painkillers to COX. COX described his response as follows: "I was like, 'Boy what in the hell are you taking about?' So immediately, I was like, somethings up here man because I talked to this dude on the phone before . . . he hasn't ever talked to me like that."

120.   At one point, COX responded as follows to the FBI agent's question about why people think COX is dirty:

> COX:   I mean . . . well you know . . . working in drugs a lot of times . . . you do walk the gray line into . . . I don't know, I guess, some people thought or think that you crossed the line at some point or something like that when it's not. I mean . . .

> FBI:   Yeah.

> COX:   I've done a lot of stuff and hey and Chris [WORTH] used to be my boss, . . . can tell you. I mean, I've done some things that have been right on the verge of – What. But never nothing dirty.

42

## STATUTORY ALLEGATIONS

### COUNT ONE

From a date unknown, but no later than in or about January 2017, and continuing until at least on or about September 21, 2021, in the Eastern District of North Carolina, and elsewhere, defendant, MICHAEL KENNETH COX, did knowingly and intentionally combine, conspire, confederate, agree and have a tacit understanding with others known and unknown to the Grand Jury, to knowingly and intentionally distribute and possess with the intent to distribute quantities of cocaine, methamphetamine, and oxycodone, Schedule II controlled substances, and marijuana, a Schedule I controlled substance, in violation of Title 21 United States Code, Section 841(a)(1).

The allegations set forth in paragraphs 1-76 and 115-120 of the foregoing Introduction are hereby incorporated by reference into Count One of this Superseding Indictment and realleged herein.

All in violation of Title 21 United States Code, Section 846.

### COUNT TWO

Beginning no later than on or about February 1, 2016, and continuing until at least on or about September 21, 2021, in the Eastern District of North Carolina and elsewhere, defendants, MICHAEL KENNETH COX and CHRISTOPHER C. WORTH, and others known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate, and agree with one or more persons to commit the following:

(a)     Mail Fraud, that is, to knowingly devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purposes of executing and attempting to execute the scheme and artifice, to knowingly place and cause to be placed in any post office or authorized depository for mail matter, any matter and thing whatever to be sent or delivered by the United States Postal Service, and to take and receive therefrom, any such matter and thing, and to knowingly cause to be delivered by mail and such carrier, according the direction thereon, and at the place at which it is directed to be delivered by the person to whom it is addressed, in violation of Title 18, United States Code, Section 1341; and

(b)     Wire Fraud, that is to knowingly devise and intend to devise a scheme and artifice to defraud and for obtaining money or property by means of materially false and fraudulent pretenses, representations, and promises, for which one or more conspirators transmitted and caused to be transmitted by means of wire communications in interstate commerce certain writings, signs, signals, pictures, and sounds, for the purposes of executing the scheme and artifice, in violation of Title 18, United States Code, Section 1343.

## OBJECT OF THE CONSPIRACY

The object of the conspiracy and the scheme and artifice was for the defendants, COX and WORTH, and others known to the Grand Jury, to enrich themselves by conspiring to deceive Wayne County through the fraudulent manipulation of bid documents and procurement processes to ensure that COX's company, which also employed WORTH, received awards for Wayne County Sheriff's Office work regardless of whether COX's company provided such work at the lowest price.

44

## MANNER AND MEANS OF THE SCHEME

In furtherance of the conspiracy and to effect the object of the conspiracy, defendants, COX and WORTH, in the Eastern District of North Carolina, committed numerous overt acts, many of which are detailed in paragraphs 1-27, 77-117, and 120 of the foregoing Introduction and hereby incorporated by reference into Count Two this Superseding Indictment and realleged herein.

All in violation of Title 18 United States Code, Section 1349.

## COUNTS THREE THROUGH TEN

From a date unknown to the Grand Jury, but beginning no later than in or about February 2016, and continuing until at least on or about September 21, 2021, in the Eastern District of North Carolina and elsewhere, defendants, MICHAEL KENNETH COX and CHRISTOPHER C. WORTH, aiding and abetting each other, did knowingly devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purposes of executing and attempting to execute the scheme and artifice, knowingly placed and caused to be placed in any post office or authorized depository for mail matter, any matter and thing whatever to be sent or delivered by the United States Postal Service, and took and received therefrom, any such matter and thing, and knowingly caused to be delivered by mail and such carrier, according the direction thereon, and at the place at which it is directed to be delivered by the person to whom it is addressed, that is, official checks from the County of Wayne to the parties as described in the chart below.

## Manner and Means of the Scheme

The allegations set forth in paragraphs 1-27, 77-117, and 120 of the foregoing Introduction are hereby incorporated by reference into Counts Three through Ten of this Superseding Indictment and realleged herein.

| Count | Victim | Date | Description |
|---|---|---|---|
| 3 | County of Wayne | 1/17/19 | County of Wayne check number 360750 mailed to Eastern Emergency Equipment, LLC ("EEE") in payment of $1,845.92 relating to a truck vault installed in the Sheriff's Tahoe. |
| 4 | County of Wayne | 11/21/19 | County of Wayne check number 374717 mailed to EEE in payment of $17,587.83 relating to four Dodge Truck "upfits." |
| 5 | County of Wayne | 12/31/19 | County of Wayne check number 376372 mailed to EEE in payment of a bill for $35,175.66 in connection with eight Dodge Chargers "upfits." |
| 6 | County of Wayne | 3/5/20 | County of Wayne check number 379451 mailed to EEE in payment of a bill for $8,782.44 relating to two Chevy Tahoe "upfits." |
| 7 | County of Wayne | 10/31/20 | County of Wayne check number 14360 mailed to EEE in payment of a bill for $40,735.32 relating to nine Dodge Durango "upfits." |
| 8 | County of Wayne | 12/7/20 | County of Wayne check number 15484 mailed to EEE in payment of a bill for $4,396.96 relating to a Chevy Tahoe "upfit." |
| 9 | County of Wayne | 4/30/21 | County of Wayne check number 21562 mailed to EEE in payment of a bill for $1,033.57 relating to nine Dodge Durango armrests. |
| 10 | County of Wayne | 5/11/21 | County of Wayne check number 21789 mailed to EEE in payment of a bill for $4,526.15 relating to a Chevy Tahoe "upfit." |

Each of the above counts constituting a separate violation of Title 18, United States Code, Sections 1341 and 2.

## COUNTS ELEVEN THROUGH THIRTEEN

From a date unknown to the Grand Jury, but beginning no later than in or about February 2016, and continuing until at least on or about September 21, 2021, in the Eastern District of North Carolina and elsewhere, defendants, MICHAEL KENNETH COX and CHRISTOPHER C. WORTH, aiding and abetting each other, did knowingly devise and intend to devise a scheme and artifice to defraud and for obtaining money or property by means of materially false and fraudulent pretenses, representations, and promises, for which one or more conspirators transmitted and caused to be transmitted by means of wire communications in interstate commerce certain writings, signs, signals, pictures, and sounds, for the purposes of executing the scheme and artifice, that is, email and text message communications described in the chart below.

## MANNER AND MEANS OF THE SCHEME

The allegations set forth in paragraphs 1-27, 77-117, and 120 of the foregoing Introduction are hereby incorporated by reference into Counts Eleven through Thirteen of this Superseding Indictment and realleged herein.

| Count | Victim | Date | Description |
|-------|--------|------|-------------|
| 11 | County of Wayne | 9/16/19 | Email transmitting fictitious quote from West Chatham Warning Device ("West Chatham") sent from Savannah, Georgia, to COX's email in Eastern District of North Carolina. |
| 12 | County of Wayne | 8/31/20 | Email from WORTH's work email account in the Eastern District of North Carolina to COX's yahoo email account providing COX with WORTH's user name and password to Performance Automotive's website listing of prices used in "upfit" installations. |

47

| 13 | County of Wayne | 9/16/20 | Email transmitting fictitious West Chatham quote from COX's Yahoo email account to WORTH's work email account in the Eastern District of North Carolina. |
|---|---|---|---|

Each of the above counts constituting a separate violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT FOURTEEN

On or about September 21, 2021, defendant, MICHAEL KENNETH COX, in the Eastern District of North Carolina, did willfully and knowingly make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, that is, COX falsely stated to an agent of the Federal Bureau of Investigation that WORTH never informed COX of a competitor's quote in order to allow COX to bid lower. The statement and representation was false because, as COX, then and there knew, WORTH routinely provided COX with information pertaining to the quotes of COX's competitors in order to allow COX to underbid his competitors.

The allegations set forth in paragraphs 1-120 of the foregoing Introduction are hereby incorporated by reference into Count Fourteen of the Superseding Indictment and realleged herein.

In violation of Title 18, United States Code, Section 1001.

## COUNT FIFTEEN

On or about September 21, 2021, defendant, MICHAEL KENNETH COX, in the Eastern District of North Carolina, did willfully and knowingly make a materially

false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, that is, COX falsely stated to an agent of the Federal Bureau of Investigation that during a telephone call on February 25, 2021, Drug Trafficker One informed COX that he had discovered a GPS tracker on his car and then stated that ". . . if it's the Sheriff's Office, let them know I got it and I'll give it back." The statement and representation was false because, as COX, then and there knew, Drug Trafficker One stated in the call, which was intercepted by law enforcement, that he had the GPS device in his hand and he hoped law enforcement tried to come get it so he could cuss them out.

The allegations set forth in paragraphs 1-120 of the foregoing Introduction are hereby incorporated by reference into Count Fifteen of the Superseding Indictment and realleged herein.

In violation of Title 18, United States Code, Section 1001.

49

## FORFEITURE NOTICE

Notice is hereby given that all right, title and interest in the property described herein is subject to forfeiture.

Upon conviction of any felony violation of the Controlled Substances Act charged herein, the defendant shall forfeit to the United States, pursuant to 21 U.S.C. § 853(a), any property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the said offense, and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the said offense.

If any of the above-described forfeitable property, as a result of any act or omission of a defendant: cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above.

Upon conviction of any one or more of the mail and wire fraud offenses alleged in Counts Two through Thirteen of this Superseding Indictment, Defendants shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(B), any property constituting, or derived from, gross proceeds obtained directly or indirectly as a result of said offenses.

50

The forfeitable property includes, but is not limited to, personal property; real property; and a forfeiture money judgment in the amount of the gross proceeds of the defendant's illegal acts.

If any of the above-described forfeitable property, as a result of any act or omission of the defendant, cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be subdivided without difficulty, it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property described above.

**REDACTED VERSION**
Pursuant to the E-Government Act and the federal rules, the unredacted version of this document has been filed under seal.

DATE: _10 -18 -2023_

MICHAEL F. EASLEY JR.
United States Attorney

BY: DENNIS M. DUFFY
Assistant United States Attorney
Criminal Division

BY: NICHOLAS HARTIGAN
Assistant United States Attorney
Criminal Division